FILED

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MAR 16 2010

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

CONSERVATION CONGRESS;
CITIZENS FOR BETTER FORESTRY;
KAREN WILSON; MARY LEE
STEFFENSEN,

Plaintiffs - Appellants,

v.

UNITED STATES FOREST SERVICE,

Defendant - Appellee.

No. 09-16182

D.C. No. 2:08-cv-02483-GEB-DAD

MEMORANDUM [*]

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted February 12, 2010
San Francisco, California

Before: HALL and McKEOWN, Circuit Judges, and ZILLY,[**] Senior District
Judge.

---

[*]    This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.


[**]    The Honorable Thomas S. Zilly, Senior United States District Judge
for the Western District of Washington, sitting by designation.

Conservation Congress, Citizens for Better Forestry, Mary Lee Steffensen, and Karen Wilson ("Conservation Congress") appeal the district court's order on cross-motions for summary judgment in favor of the United States Forest Service and against Conservation Congress. This is an action challenging the Forest Service's planned forest-thinning project (the "East Fork II Project") in the East Fork South Fork Trinity River Watershed in the Shasta-Trinity National Forest ("STNF"). The district court held that the Forest Service complied with the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600, et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's decision.

## I.    Background

The East Fork II Project proposes forest thinning on approximately 931 acres of the STNF. The purpose of the Project is to make the forest more resilient to wildfire. The Forest Service disclosed the expected environmental impacts of the Project in the East Fork II Environmental Assessment ("EA"). The Forest Service prepared the East Fork II EA in an effort to comply with this Court's ruling in Environmental Protection Information Center v. United States Forest Service, No. 05-17093, 234 Fed. Appx. 440 (9th Cir. May 9, 2007), which concerned the

project in its original form (the "East Fork I Project"). On April 9, 2008, the Forest Service issued a Decision Notice and Finding of No Significant Impact for the East Fork II Project.

## II.    Standard of Review

A district court's decision to grant or deny summary judgment is reviewed de novo. See Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001). Conservation Congress's NFMA and NEPA challenges are reviewed under the Administrative Procedure Act ("APA"). See The Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) ("Lands Council II"). Under the APA, an agency action may be held unlawful and set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## III.    Analysis

### A.    Conservation Congress's NFMA Challenge Regarding Pacific Fisher

NFMA imposes a substantive duty "to provide for diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B), and this "duty to maintain viable populations 'applies with special force to "sensitive" species.'" Ecology Ctr., Inc. v. Austin, 430 F.3d 1057, 1068 (9th Cir. 2005), overruled on other grounds, Lands

Council II, 537 F.3d at 990. The Pacific fisher is a furbearing mammal, which is designated as a "sensitive" species in Forest Service Region 5. To manage for "diversity," the STNF's Land and Resource Management Plan ("LRMP") provides that "management indicators will be managed to average moderate levels of habitat capability models." The LRMP sets forth a habitat capability model ("HCM") for the Pacific fisher. The LRMP also sets forth a "Monitoring Action Plan" for the Pacific fisher that requires the Forest Service to "[d]etermine population and habitat trends within designated fisher . . . habitat." The LRMP's Monitoring Action Plan allows for "field review of project planning using habitat capability models."

Conservation Congress argues that NFMA and the LRMP require the Forest Service to directly monitor Pacific fisher populations in addition to fisher habitat. We disagree. The Ninth Circuit has "repeatedly approved 'the Forest Service's use of the amount of suitable habitat for a particular species as a proxy for the viability of that species,'" and its use of "'habitat as a proxy to measure a species' population.'" Ecology Ctr. v. Castaneda, 574 F.3d 652, 664 (9th Cir. 2009) (quoting Lands Council II, 537 F.3d at 996 & n.10).

Conservation Congress argues that the Forest Service failed to disclose how much habitat will be degraded from high- to moderate-capability fisher habitat as a

09-16182

result of reducing crown cover below the 70% required for high-capability fisher habitat. The Forest Service responds, correctly, that there is no requirement to manage to high capability. The LRMP only requires management "to average moderate levels of habitat capability models." The Pacific Fisher Addendum, which the Forest Service considered as part of its environmental assessment of the Project, found that "[t]here is no specific evidence that changes in canopy closure, while retaining key habitat components such as large trees, would cause significant scale or intensity changes in fisher behavior," and that "[t]he thinning treatments would change vegetation, though these changes in vegetation would not significantly alter habitat for fisher." Based on these findings, the Pacific Fisher Addendum found that "there is no change in the population trend." Conservation Congress has failed to demonstrate that these findings are arbitrary and capricious.

Conservation Congress argues that the Project will "eliminate the suitability" of fisher habitat in Riparian Reserves as a result of logging to within 50 feet of the high water mark, leaving only a 100-foot riparian travel corridor for the Pacific fisher. Conservation Congress correctly points out that the fisher HCM provides that moderate-capability fisher habitat requires a 300- to 600-foot riparian travel corridor. Conservation Congress has failed, however, to support its assumption that forest thinning will eliminate the suitability of the habitat to function as a

riparian travel corridor. Moreover, as noted in the Pacific Fisher Addendum, only 74 acres of Riparian Reserves (< 1% of the capable fisher habitat in the assessment area) will be thinned, and these acres are associated only with "intermittent and ephemeral streams." Riparian travel corridors associated with perennial streams will be undisturbed by the Project. The EA concluded that "[b]ecause fisher are highly mobile, the project is of small scale and not proposed in primary travel corridors . . . , and the occurrence of suitable habitat surrounding project units, disturbance-related effects are likely to be minor." Conservation Congress has failed to demonstrate that these findings are arbitrary and capricious. Conservation Congress argues that the Forest Service's reliance on the availability of oak hardwoods in evaluating the suitability of post-Project fisher habitat is misplaced because only low-capability fisher habitat lists hardwoods. This argument fails because, as noted in the fisher HCM, both high- and moderate-capability habitats include "Montane Hardwood Conifer" and "Montane Riparian." Furthermore, deciduous trees (such as oak hardwoods) may comprise up to 50% of the tree canopy for high-capability fisher habitat, and up to 75% of the tree canopy for moderate-capability fisher habitat.

Conservation Congress argues that the Forest Service failed to analyze how much suitable fisher habitat would remain in the Project area after the Project was

completed.  The EA, however, classified about two-thirds of the acres in the Project area as capable fisher habitat, using the fisher HCM, and found that "current habitat capability levels . . . will not change."

Lastly, Conservation Congress argues the Forest Service improperly relied on "anecdotal evidence" to satisfy its NFMA obligations.  Conservation Congress has failed to show that the Forest Service did not consider the best scientific data. See Ecology Ctr. v. Castaneda, 574 F.3d at 659-60.

**B.      Conservation Congress's NFMA Challenge Regarding Management Indicators**

Conservation Congress argues that the Forest Service's use of habitat components to monitor management indicator assemblages violates NFMA's "diversity" requirement, 16 U.S.C. § 1604(g)(3)(B), and the LRMP's requirement to monitor the impacts of site-specific projects on management indicator species. Conservation Congress's central complaint is that the Forest Service failed to survey for management indicator species in the Project area.  This argument fails because the LRMP does not identify any management indicator species.  Although the LRMP "recommends for monitoring" twenty-two species "that are highly associated with the habitats and habitat components on the Shasta-Trinity National Forests," the LRMP does not label these species as "management indicator

09-16182

species." Instead, the LRMP identifies nine "wildlife assemblages" of "management indicators," which the Forest Service refers to as "management indicator assemblages." The LRMP allows the Forest Service to use "habitat components to represent the assemblages." NFMA does not require the Forest Service to verify its prediction regarding the effect of the East Fork II Project on the management indicator assemblages with "observation or on-the-ground analysis." See Lands Council II, 537 F.3d at 990. The district court properly held that the Forest Service complied with NFMA in its analysis of management indicator assemblages.

## C. Conservation Congress's NEPA Challenge to the Environmental Assessment

Conservation Congress argues that the Forest Service violated NEPA by not adequately disclosing the Project's impacts on several sensitive, threatened and endangered species and on water quality in the East Fork II EA. The Forest Service conducted a thorough analysis of the impacts of the Project on the Northern Spotted Owl and disclosed "resource protection measures" to minimize the impacts. We reject Conservation Congress's "cumulative impacts" and "activity centers" arguments with respect to the Northern Spotted Owl. Regarding the Pacific fisher and other sensitive species, Conservation Congress has failed to

identify any specific deficiencies in the Forest Service's analyses. Instead, Conservation Congress argues that the Forest Service violated NEPA by not monitoring the fisher or other sensitive species. NEPA is a procedural statute, and Conservation Congress has failed to provide any legal authority that would impose a duty on the Forest Service under NEPA to monitor species populations. Conservation Congress asserts that the EA fails to adequately disclose impacts on coho and Chinook salmon without identifying any specific deficiencies in the Forest Service's analyses. As far as water quality is concerned, the Forest Service complied with NEPA by completing a Cumulative Watershed Effects analysis and obtaining an analysis by a geologist. We reject Conservation Congress's argument that the Forest Service violated NEPA by not following all of the recommendations set forth in the Watershed Analysis. The EA adequately disclosed impacts resulting from increased sediment yield and adequately addressed how the proposed forest thinning in Riparian Reserves will attain the Aquatic Conservation Strategy objectives.

D.     **Conservation Congress's NEPA Challenge Regarding an Environmental Impact Statement**

Conservation Congress argues that the Forest Service violated NEPA by not preparing an Environmental Impact Statement ("EIS"). Conservation Congress has failed "to raise substantial questions" that the Project may significantly affect the Pacific fisher, the Northern Spotted Owl, salmon and fish habitat, and water quality. See Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998). Conservation Congress has failed to demonstrate that the Forest Service's proxy on proxy approach to monitoring the Pacific fisher translates into "highly uncertain" effects. See Lands Council II, 537 F.3d at 996-97 ("[T]he Forest Service's assumption that maintaining acreage necessary for survival would ensure a species' survival" has been held to be "eminently reasonable."). We give the Forest Service "great deference as it made a scientific prediction within the scope of its technical expertise." See Ctr. for Biological Diversity v. Kempthorne, 588 F.3d 701, 712 (9th Cir. 2009). Conservation Congress has failed to demonstrate that the Project may significantly affect water quality as a result of the reduced Watershed Condition Class rating for the Dark Canyon subwatershed in light of the short-term nature of this impact. Conservation Congress has "cherry pick[ed] information and data out of the administrative record" to support its position, but this "does not mean that a project is highly controversial or highly uncertain." See Native Ecosystems Council v.

U.S. Forest Serv., 428 F.3d 1233, 1240 (9th Cir. 2005). Conservation Congress waived its cumulative impacts argument by not raising the issue during the public comment period and administrative appeals process. See Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65 (2004); Barron v. Ashcroft, 358 F.3d 674, 677 (9th Cir. 2004).

**E.     Conservation Congress's NEPA Challenge Regarding A Supplemental Analysis**

Conservation Congress argues that the Forest Service violated NEPA by failing to prepare a supplemental NEPA analysis based on the monitoring of previously logged areas, and the November 2007 finding that two landings were not draining properly and were concentrating runoff and delivering sediment to Prospect Creek. Conservation Congress has failed to demonstrate that the requirement to supplement applies to environmental assessments, and even if it does, that the information presented constituted "significant new circumstances." See 40 C.F.R. § 1502.9(c)(1)(ii). The information was not significant because, as the November 2007 study indicated, "[m]ost of the roads were properly shaped and drained." The information was not new because the EA analyzed the Project's effects as a result of increased erosion and sediment. The Forest Service's decision

not to supplement the EA cannot be held to be a "clear error of judgment." <u>See</u>

<u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378 (1989).

**AFFIRMED.**